**CITIES SERVICE OIL CO. v. THE CHAMPOEG et al.**

United States District Court
S. D. New York.

Oct. 21, 1952.

Atkins & Weymar, Horace T. Atkins, New York City, for libelant.

Myles J. Lane, U. S. Atty., New York City, for respondent, United States.

Nelson, Healy, Baillie & Burke (Allan A. Baillie, New York City, of counsel), for respondent Tankers Co. Inc.

WRIGHT, District Judge.

The libel herein filed contains two causes of action arising out of two shipments of petroleum products in the Tanker Champoeg pursuant to voyage charter parties entered into between the libelant and the respondent. The first cause of action relates to the alleged contamination of kerosene while still aboard the vessel and the second cause of action relates to a shortage in delivery of Aviation gasoline, kerosene and slop. In addition to a defense on the merits as to both causes of action, respondent also claims that the first cause of action is time-barred.

The issues of fact and law having come on to be heard on the pleadings and proofs of the parties and due deliberation having been had, the court now makes the following findings of fact and conclusions of law.

Findings of Fact Common To Each Cause of Action

1. This action was commenced by the filing of the libel on July 9, 1948.

2. At all times material to this action, libelant was a corporation having its principal office for the transaction of business at 70 Pine Street, Borough of Manhattan, City, County and State of New York.

3. At all times material to this action, libelant owned the cargo involved in each cause of action herein.

4. At all times material to this action, each of the shipments involved herein were to be carried and delivered subject to the terms of the charters for the respective voyages. The terms of the charters pertinent to the two causes of action herein are as follows:

"6. Safe Berth. Shifting. The Vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided that the Vessel can proceed thereto, lie at and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to the next berth, charges for running lines on arrival at and leaving that berth, wharfage and dockage charges at that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time lost to the Vessel on account of shifting shall count as used laytime except as otherwise provided in WSA Rate Orders and Rate Advices.

"7. Pumping in and out. Hoses. (a) The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections where delivery of the cargo shall be taken by the Charterer or consignee. The Vessel, after discharging shall, if requested by the Charterer, clear shore pipelines of oil by pumping water through them, the time consumed to count as used laytime. The Vessel shall furnish her pumps and the necessary steam for discharging in all ports where the regulations permit of fire on board, as well as necessary hands. Should regulations not permit fires on board, the Charterer or consignee shall supply, at its expense, all steam necessary for discharging as well as loading, but the Owner shall pay for the steam supplied to the Vessel for all other purposes. If cargo is loaded from lighters, the Vessel, if permitted to have fires on board, shall, if required, furnish steam to lighters at Charterer's expense for pumping cargo into the Vessel.

"(b) Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected.

"(c) Unless notation or exception is made in writing on the bill of lading, or other shipping document before departure of the Vessel from the dock or place at which the said cargo is delivered, receipt of the cargo shall be deemed prima facie evidence of right delivery of the entire cargo as described in the bill of lading; further, that upon failure or refusal by the Charterer or its representative to execute or except to the ullage reports prepared by the Vessel, the figures stated

in said ullage reports shall be deemed prima facie correct and binding upon the parties hereto.

"16. Cleaning (b) If the Vessel may not pump ballast water or slops overboard or otherwise dispose of them at or en route to the port of loading, the Charterer shall provide facilities for that purpose and charges for handling, storage or disposal of ballast water and/or slops shall be for the Charterer's account. Time consumed discharging ballast water or slops shall not count as laytime. Any delay by the Charterer in furnishing facilities for the disposal of ballast water or slops shall count as laytime.

"18. General Exceptions. Clause. Neither the Vessel nor the Master nor Owner shall be or shall be held liable for any loss of or damage or delay to the cargo or for any failure in performing hereunder arising or resulting from:—Any act, neglect or default of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the vessel; barratry; fire, unless caused by the personal design or neglect of the owner; collision; stranding; perils, dangers or accidents of the seas or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk or any loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer, shipper, consignee, owner of the goods or holder of the bill of lading, their agents and representatives; insufficiency of packing; insufficient or inadequacy of marks; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery, equipment or appurtenances; unseaworthiness of the vessel whether existing at the beginning of the voyage or developing during the voyage unless caused by want of due diligence on the part of the Owner to make the vessel seaworthy or to have her properly manned, equipped, and supplied; leakage; shrinkage; evaporation; change in quality of the cargo; handling or transportation losses; difference between actual or reported intake and outturn quantities; stowage or contact with or leakage from other cargo; discoloration; contamination; deterioration; any consequence arising out of shipping more than one grade of cargo; or from any other cause arising without the actual fault or privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer shall, unless otherwise in this Charter expressly provided, be responsible for any loss of or damage or delay to or failure to discharge or deliver the cargo arising or resulting from:—Act of God; act of war; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; seizure under legal process provided bond is promptly furnished to release the vessel or cargo; strikes, lockouts, stoppage or restraint of labor from whatever cause whether partial or general; or riot or civil commotion. No exemption afforded the Charterer under this clause shall relieve the Charterer of or diminish its obligations for payment of any sums due the Owner under other provisions of this Charter.

"23. Limitation of Liability (b) The Owner and the vessel in all matters arising under this Charter Party or any bill of lading issued hereunder shall be entitled to the like privileges, rights, and immunities as are contained in Sections 3(6), 4 and 11 of the Carriage of Goods by Sea Act of the United States approved April 16, 1936 [46 U.S.C.A. §§ 1303(6), 1304, 1310]."

5. At all times material hereto, the United States of America was the owner of and operated, managed and controlled the SS Champoeg, a tanker of the type known as T–2, as a merchant vessel of the United States of America.

6. In so far as United States of America is concerned, libelant elected to proceed under the libel in accordance with the principles of suits *in rem*, without the preclusion of any relief *in personam*.

7. Each of the charter parties being signed by respondent, Tankers Company Incorporated, as agent for respondent United States of America, and not as principal, libelant has abandoned the issue as to liability of respondent, Tankers Company Incorporated, and has agreed to withdraw the libel as to respondent Tankers Company Incorporated.

8. Libelant admits with respect to each shipment, that no loss, contamination or shortage occurred prior to the arrivals of the tanker Champoeg at the ports of discharge.

9. The issues to be tried as formulated by the Court at pre-trial conference are as follows:

(1) (a) Whether or not the first cause of action alleged in the libel is barred by the terms of the charter party in view of the circumstance that the action was not commenced within one year from the time the shipment was delivered at destination.

(1) (b) Conversely, whether or not the action was timely commenced, in so far as the first cause of action is concerned, in that it was filed within two years from the time the alleged cause of action arose, which is the period set forth in the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.

(2) Were there contaminations and/or shortages and/or losses as complained of in the libel and if so, did they occur in whole or in part after or before the cargo left the permanent hose connections of the vessel?

(3) If it be found that there were contaminations and/or shortages and/or losses as complained of in the libel and that they occurred in whole or in part before the cargo left the permanent hose connections of the vessel, was the cause thereof one for which the respondent is or is not liable under the terms of the contracts of carriage?

10. Libelant owns, among other petroleum terminals, a bulk petroleum products terminal located at East Braintree, Massachusetts, where petroleum products are received from large tankers and pumped through various designated main pipelines and intersecting lines leading from the dockhead at the tanker berth to shore tanks. In addition to the terminal berth for the discharge of tank vessels, the plant also includes a barge berth, the center line of the barge pier extending at right angles from the tanker pier approximately sixty-five feet from the tanker berth dockhead. The purpose of the barge berth is to load oil barges from shore tanks. The layout of the East Braintree plant is on a hill and slopes down toward the waterfront. Oil products may be gravitated from the tanks and loaded into barges at the barge berth or at the tanker pier solely by force of gravitation and without using electrical or steam power. The tanks at East Braintree are so much higher than a ship at the discharging berth that by reversing a few of the valves aboard the ship, petroleum products can be gravitated from the shore tanks into the ship solely by power of gravitation.

11. The tanker transfer dock is equipped with three sets of hoses, each set consisting of three lengths of approximately thirty feet. Previous to the arrival of a ship, which usually is split cargo, the hoses are connected on the dock end of the line to the particular line which is going to be used in the discharge of the vessel arriving. If the vessel is carrying a split cargo of kerosene, No. 2 fuel oil and gasoline, one hose is connected to the kerosene line, another hose to the No. 2 fuel oil line, and another to the gasoline line. On the end of each hose is a flange and on the ship is a flange, and these flanges are put together and bolted, and in that way connected to the discharge pipes of the ship.

12. At the dockhead there were four twelve inch and one ten inch cargo lines. At the time of the discharge of the Champoeg, these cargo lines were connected with two cross-over lines equipped to permit the introduction of air. One of these cross-over lines was used to clean the hose to the ship after discharging was finished. The other was used for the purpose of blowing out the main cargo discharge lines.

13. The cross-over line at the dockhead used to clean out hose connecting the ship's discharge lines to the shore lines, was equipped with high pressure valves. Each one of the five pipelines on the dock had

one of these high pressure valves installed between the flange or hose connection and the master valve or dockhead valve. Behind these valves were another series of check valves.

14. Libelant proved that no leakage occurred, and no contamination resulted from either of the two cross-over air lines at the dockhead. Each line had a gate valve and also a check valve connected to it. The check valve prevented a reverse flow in the line. High pressure valves were proved to be fit and proper.

15. Approximately sixty or sixty-five feet shoreward on the four twelve inch and one ten inch main pipelines, the lines are intersected with six inch lines which terminate at the barge loading section of the barge berth. Near the point of intersection, each six inch line is equipped with a gate valve. There are no valves on the twelve inch lines at the point where such lines are intersected by the six inch branch lines leading to the barge loading terminal. The valves on the six inch branch lines are closed when the barge berth is not occupied. To load a barge, after the product reaches the terminal of the six inch pipelines, a hose, supplied by the barge, is swung over from the barge and connected to the terminal of the appropriate six inch pipeline. In other words, the petroleum product would go through the twelve inch line as far as the branch line which goes to the barge pier, and then it would go through the valve there over to the valve on the end of the barge pier and then through the hose into the barge.

16. The pipelines running to the various storage tanks usually are kept full with a particular petroleum product. This results in an accurate computation of petroleum products delivered to the plant by tankers. It eliminates the uncertainty which would arise if a pipeline were empty before receiving a petroleum product and full after the receipt of such product. In other words, the pipeline is full when a vessel starts loading, and full when a vessel completes loading. In this manner a vessel receives credit for delivery of the full pipeline at the commencement of discharge, but receives no credit for the full pipeline at the completion of discharge. The main lines are always full before and after a discharge of a ship.

17. Each of the main lines, about three feet shoreward from its dock end, is equipped with a cock from which samples of the petroleum product entering the lines from the discharging ship may be taken.

18. Although the pipelines on the dock are practically on a level, nevertheless, the force of gravitation acting upon petroleum products from shore tanks is sufficient to keep the twelve inch line full. Indeed, the gravitation is such that by reversing a few valves aboard the tanker, petroleum products can be gravitated from the shore tanks into the ship solely by the power of gravitation.

19. At all material times, the SS Champoeg was a T–2 type tanker owned and operated by the United States of America. She had nine cargo tanks designated numerically from fore to aft. She had three main suction lines for loading or discharging cargo designated starboard, center and port. The starboard line serviced tanks 1 through 4, the center line tanks 5 and 6 and the port line tanks 7 through 9. These lines passed beneath the tanks into the pumproom aft, thence through three main pumps, starboard, center and port, to the deck and finally to the manifolds or permanent hose connections on either side of the ship. On loading or discharging, flexible hoses, supplied by charterers, connected the shore lines with the manifolds. Between the starboard and center lines, there was a cross-over in the way of the number 5 tank. Between the center and port lines there was a cross-over in the way of the number 7 tank. There were cross-overs between the starboard and center lines and the center and port lines in the pumproom. In each of the cross-overs, there were two block valves. There were further cross-overs between the lines at the manifolds. The cross-overs were equipped with spectacle flanges. On the two occasions in question, however, these spectacle flanges were open. Besides the main suction lines, the ship was equipped with a stripping system. This was a line connected with all of the tanks and smaller in diameter than the main

suction lines. Both electric and steam pumps could be used on this system, designed to permit the cargo remaining in the tanks after the main suction lines lost suction to be discharged.

### Findings of Fact as to The First Cause of Action

20. On April 14, 1947, at the port of Lake Charles, Louisiana, libelant delivered to the tanker Champoeg, and the tanker Champoeg received in good order and condition, the following merchandise in bulk: 49,294.78 net barrels of kerosene, and 71,235.68 net barrels of No. 2 fuel oil.

21. The Champoeg docked at East Braintree, Massachusetts, on April 21, 1947 at 11 A. M. Thereupon two eight inch hoses were connected to the center line discharge manifold of the ship for discharge of the No. 2 fuel oil, and one eight inch hose was connected to the port line manifold of the ship for discharge of kerosene.

22. Under supervision of Chief Officer A. Clifton Barnett, Jr., the ship was lined up for discharge of No. 2 fuel oil in tanks 1, 2, 3, 4, 5, 6, through the ship's starboard and center suction lines using cargo pumps No. 2 and No. 3 in center deck lines.

23. The center and starboard suction lines were joined through cross-over valves in the way of No. 5 tank and in the pump room.

24. The Champoeg was lined up for discharge of kerosene through her port suction line, using No. 1 cargo pump into the port deck line.

25. All cross-overs between the ship's port and center lines were ostensibly closed in the pump room, and the cross-over valves between the port and center suction lines in way of No. 7 tank were ostensibly closed.

26. The dockman was asked by the Chief Officer of the Champoeg to take samples of kerosene through the bleeder plug on the dock at half hour intervals to determine if kerosene held up to color specifications.

27. The No. 2 fuel oil was carried in forward tanks 1, 2, 3, 4, 5, 6; kerosene in tanks 7, 8, 9. Tanks 1 through 4 were on the starboard suction line; 5 and 6 on center line; 7, 8 and 9 on the port line.

28. The starboard and center suction lines were crossed over, i. e., joined together, and the ship so lined up that tanks 1 through 6 were discharging from the starboard and center lines through the starboard and center pump and on through the center discharge line through the manifold and thence to shore.

29. Kerosene was lined up to the port suction tanks 7, 8 and 9 direct into the port pump and thence through the port line to the shore.

30. Discharge of kerosene commenced at 12:50 P.M., April 21, 1947.

31. Discharge of No. 2 fuel oil commenced at 12:55 P.M.

32. Several times immediately after starting discharge operations, and during the afternoon, the Chief Officer of the Champoeg went on the dock and looked at the kerosene samples being taken from the line through the bleeder plug on the dock, and all samples were colorless.

33. At 5 P.M. on April 21, 1947, Night Mate J. Gage relieved Chief Officer A. Clifton Barnett, Jr.

34. The pumps lost suction of No. 2 fuel oil at 4 A.M. on April 22, 1947, and lost suction of kerosene at 4:30 A.M. At 7 A.M. Chief Officer notified that all kerosene in the shore lines which had been received from the Champoeg was off color.

35. Investigation by the ship indicated that the sampling of kerosene on the dock had continued until midnight but that no samples had been taken after midnight. It was apparent that up until midnight the kerosene was sampled and found colorless.

36. The lineup of the ship's suction and discharge line and valves were checked and inspected by the Chief Officer of the Champoeg, and found to be the same as when discharging began, with the exception of being lined up to strip the kerosene.

37. Libelant's East Braintree plant is equipped, among other lines, with a twelve inch pipeline which goes direct to No. 6 kerosene storage tank, which is located about 1,400 feet from the tanker berth.

38. Kerosene storage tank No. 10 also is located about 1,400 feet from the tanker berth but on a higher elevation. In order to get kerosene from the discharging ship to No. 10 tank, a pump is used which takes suction on a line which is connected to the twelve inch line to No. 6 tank and discharged through a smaller line—a six inch line—to No. 10 tank. This six inch line runs through what is known as No. 1 pumphouse, which is used to pump nothing but kerosene. A line runs from the manifold in No. 1 pumphouse to No. 10 tank.

39. Kerosene storage tank No. 69 is located about 1,600 feet from the tanker berth. In order to get kerosene to tank No. 69, it would take the same course as kerosene going into No. 10 tank. By closing the valve leading to tank No. 10 and opening the valve leading to tank No. 69, the kerosene would be diverted into tank No. 69.

40. When a tanker is loaded with petroleum products at a Gulf port, for instance at Lake Charles, for discharge at East Braintree, the personnel of the East Braintree plant is notified of the expected arrival date of the tanker, and of the character and quantity of her cargo. Thereupon a measurement is made of the shore tanks which are going to be affected by the receipts of petroleum products from such tanker. Mr. Bicknell, who has been in the employ of libelant twenty-eight years at East Braintree, and who was supervisor of all operations which took place within the plant, would then instruct Mr. Hanson, gauger and traffic clerk, who has been in the employ of libelant twenty-five years at East Braintree, to measure the tanks which were to receive petroleum products from the tanker.

41. Prior to the arrival of the Champoeg at East Braintree, kerosene shore tanks Nos. 6 and 10 had been measured in anticipation of the receipt in such tanks of kerosene from the Champoeg.

42. Storage tank No. 69 also is used for kerosene, and prior to the discharge of the Champoeg, had been measured and contained 3,253.80 barrels of kerosene. Tank No. 69 is smaller than kerosene shore tanks Nos. 6 and 10, having a capacity of only 10,555 barrels.

43. The tank barge Harmony arrived at the barge berth on April 22, 1947, and commenced to load kerosene by gravitation from shore tank No. 6 at about 6:30 A.M. A sample which was taken at about 7 A.M. was found off color as the result of contamination with No. 2 fuel oil. After taking a sample from the Harmony and noting the contamination, the loading of kerosene into the barge Harmony was stopped. Subsequently, but after the Champoeg had completed her discharge, the contaminated kerosene from the Harmony was pumped back to No. 6 shore tank. The records show that the Harmony had loaded 2,339 barrels of kerosene.

44. The Champoeg commenced discharging kerosene at East Braintree on April 21, 1947, at 12:50 P.M. Discharge continued until April 22, 1947, at 4:30 A.M., at which time the pump used for the kerosene discharge lost suction. During this period the kerosene was pumped from the Champoeg through the main twelve inch kerosene pipeline direct to tank No. 6, and also to tank No. 10 through a line which branches off the main twelve inch kerosene pipeline and by suction to tank No. 10, via No. 1 pumphouse, which is used to pump nothing but kerosene. During such pumping discharge of kerosene from the Champoeg between the commencement of discharge at 12:50 P.M., April 21st, and the stoppage by loss of suction on April 22nd at 4:30 A.M., No. 6 tank received 32,765.82 barrels and No. 10 tank received 15,593.45 barrels.

45. The pumping discharge of kerosene by the Champoeg stopped because of loss of suction at 4:30 A.M. April 22, 1947, and remained stopped until 8:15 A.M. of the same day, when stripping kerosene commenced and continued for twenty minutes, until 8:35 A.M., at which time the stripping of kerosene was stopped while tests were made ashore.

46. The kerosene pumped from the Champoeg recommenced at 8:15 A.M. after tank No. 69 had been lined up ashore. The uncontaminated kerosene pumped ashore

from the Champoeg through her stripping line, commencing at 8:15 A.M. and ending at 8:35 A.M., was pumped through the main kerosene line, and the six inch line running through No. 1 pumphouse to tank No. 10. This pumping operation of uncontaminated kerosene cleared the line leading to tank No. 10 of contaminated kerosene by displacing the contaminated kerosene with the uncontaminated kerosene during the pumping between 8:15 A.M. and 8:35 A.M.

47. The pumping discharge of kerosene from the Champoeg through the stripping line again was recommenced at 10:35 A.M. The kerosene so pumped was routed to tank No. 69 and received in tank No. 69 in an uncontaminated condition. The quantity thus pumped into tank 69 amounted to 745.40 barrels. The Champoeg completed discharging kerosene at 2 P.M., April 22, 1947.

48. The tank barge Harmony arrived after the kerosene pumps on the Champoeg lost suction. Thereafter the Harmony commenced to load kerosene from No. 6 shore tank by gravitation. Having an elevation of between forty to sixty feet, the kerosene line between shore tank No. 6 and the dockhead would remain filled by force of gravitation notwithstanding the Champoeg had ceased pumping. Under such conditions, to effectuate the loading of the barge Harmony, the valve on the shore tank itself would be open; the valve on the six inch connecting line running off the main line at a distance of sixty-five feet from the dockhead would be opened; and a valve at the end of the branch line which permits kerosene to run out through the barge's hose connection would be opened. Upon the opening of the valve on the six inch intersection with the twelve inch line, the kerosene which remained in the twelve inch line between such intersection (sixty-five feet from the dockhead) and shore tank No. 6 would enter the six inch branch line, flow through it, and continue on through the barge's hose and into the barge. The kerosene between such sixty-five foot intersection and shore tank No. 6 would not commingle with the kerosene in the main line between the dockhead and the point of the sixty-five foot intersection. The kerosene in the main line between the dockhead and the sixty-five foot point of intersection with the six inch line would act as a buffer. In other words, the opening of the valve in the six inch line would have the effect of shunting the kerosene from the main line to the branch six inch line, and then, if the valve at the barge end of the six inch line were opened, the kerosene would flow through the barge hoses into the barge. Mr. Bicknell so testified. Expert Doucette proved this by an experiment. Thus samples taken at the dockhead reflected the condition of the kerosene as it left the ship's manifold. Even respondent's witness, Lunn, conceded the correctness of the statement. The kerosene became contaminated before it left the ship's manifold.

49. The samples of kerosene taken from the Harmony, and from No. 6 tank, and from No. 10 tank, and from the bleeder, about three feet from the dockhead, all had a distinct yellowish color.

50. About five hundred feet from the dock end of the kerosene twelve inch line, there is an eight inch connection, or "jumpover", between the kerosene line and the No. 2 fuel line. The connection was put in in case at some future time it was desired to utilize another tank for kerosene. In such jump-over connection there was a blind, or spectacle, valve. Mr. Bicknell described this as a round piece of steel plate placed between two flanges, and bolted so that absolutely no oil could go either way through it. The purpose was to be sure that there was no connection between a No. 2 fuel and a kerosene line which would permit the leakage of one product into the other. Mr. Doucette regarded the blank as a "dead end". To remove or open a spectacle blank is a major job. The bolts that hold one or more sections of the pipeline together must be removed in order to swing the blank in either an open or a closed position.

51. Libelant proved that the cause which produced the contaminated kerosene involved in the first cause of action did not arise or occur on shore.

52. The Champoeg was a T-2 type of oil tanker. This type was built about at the outbreak of the second world war, and par-

ticularly for the war effort. They were built as a three-sectional ship divided with separate pipelines, and flexible enough to carry one cargo, if it were so desired, or three or more kinds of petroleum products. Prior to the war very few tankers carried split cargoes of petroleum products. The type T-2s were larger than the usual tanker previously operated. Because older plants did not have shore tanks available to take a full load from a T-2, it was necessary for the vessels to carry split cargoes.

53. The history of the Champoeg indicates that she was not kept in fit condition at all times safely to discharge split cargoes of petroleum products free from contamination. Thus Captain Thomas M. Brown was assigned to and became Master of the vessel on May 5, 1947, and remained Master until the vessel was sold on September 1, 1947. Captain Brown was sent to the vessel by the Marine Superintendent of Tankers Company Incorporated, with instructions to try to straighten out the vessel. Captain Brown had the history of prior contaminations of cargo. In a report to the operators of the vessel, Tankers Company Incorporated, Captain Brown mentioned "a bad weld in center No. 6 tank into center No. 7 leaking, also between No. 7 across and No. 5 center and starboard." Captain Brown also mentioned in his report that the "heating coils are gone completely as on loading cargo pressure sometimes forces gas through leaks from tank on to the deck." Also Captain Brown in his report stated that "the cross-overs in the pump room leaked when the pressure was from the center line."

54. Captain Brown, in his report to the operators dated July 12, 1947, among other things, reported that "Engineers are seeing to putting in of blanks (spectacle blanks) in lower level in pumproom separating lines and at upper level, inspection plates have been taken off and as there was rust and leakage, are putting a drain valve under each cross over to check against contamination and to relieve valve of rust."

55. On the voyage involved in the first cause of action, No. 2 fuel oil was carried in forward tanks 1, 2, 3, 4, 5, and 6. Kerosene was carried in tanks Nos. 7, 8 and 9. Tanks 1 through 4 were on the starboard suction line; 5 and 6 were on the center line; and 7, 8 and 9 were on the port line. The starboard and center suction lines were crossed over, that is joined together, and the ship was so lined up that tanks 1 through 6 were discharged from the starboard and center suction lines, through the starboard and center pump, and on through the center discharge line, through the manifold, and thence to shore. The kerosene was lined up to the port suction line, tanks 7, 8 and 9 direct into the port pump, and thence on deck and through the port line to the shore. The convergence of the fuel oil into the center discharge line would increase its pressure more so than if only one pump was used for No. 2 fuel oil instead of two pumps. The ship's port suction line used for the discharge of kerosene only was served by only one pump. The distance from the point where the fuel oil in the starboard ship's line converged with the fuel oil in the ship's center line to the manifold was about two hundred feet. The starboard line was crossed over to the center line. The spectacle blanks were open on this cross-over. Libelant's witness, Deffler, found the same condition when he was aboard the Champoeg at East Braintree in July, 1947. He noted the Champoeg was equipped with spectacle blanks, but that "They were not closed; they were open."

56. On a type T-2 tanker there are twenty-six possibilities for contamination of material if one or more valves leak, providing the vessel has a split cargo aboard.

57. The Champoeg loaded a total of 49,-294.78 barrels of kerosene. She discharged 49,320.47 barrels of kerosene, an overage of say twenty-six barrels. Mr. Harmon, libelant's superintendent at East Braintree, states his experience shows a normal loss of kerosene to be about three-tenths of one per cent between Lake Charles and East Braintree by evaporation. This would make a normal loss of say one hundred forty-seven barrels. On such basis, the Champoeg delivered one hundred seventy-three barrels of kerosene more than would normally be expected. Such overage is accounted for by the commingling of fuel

oil and kerosene. That the overage was not greater is probably accounted for by kerosene commingling with fuel oil during the half hour from 4:00 A.M., April 22nd, to 4:30 A.M., April 22nd, during which period the ship was not pumping fuel oil, but was pumping kerosene, making an unequal pressure between the two lines, which would have the effect of kerosene leaking through the cross-overs into the fuel oil. The leakage of kerosene into the fuel oil would not deteriorate the fuel oil.

58. The circumstance that the ship's tanks reflected an uncontaminated kerosene after the discovery that the ship was pumping ashore contaminated kerosene is explained by the circumstance that the contamination occurred as the result of the leakage of oil through the cross-over from the ship's oil line to the ship's discharging kerosene line.

59. In his letter report Captain Brown stated as follows: "At 10:30 A.M. July 14th, 1947 kerosene was finished as far as main pumps and everything was lined up to use electric strippers, shortly after starting contamination was noted and kerosene was stopped at 10:45 A.M. I believe the same thing happened as on the other, with the slop going ashore at full pressure and kerosene light the slop forced through the cross-overs as the Master valves on deck held." There is no evidence that the same situation regarding such unfitness of the Champoeg did not exist in April, 1947.

60. The Champoeg was unseaworthy in that she was not in fit condition to discharge a split cargo, for the reason that her spectacle blanks in the cross-overs, including the pump room, were open.

61. At East Braintree libelant tests its tanks periodically to find out if the stored products are standard. Every time a shipment is made from East Braintree by a tank barge or by a tank car, samples are taken and checked before making shipments. If the product in the shore tank were off test, it would be caught immediately.

62. The United States of America being the owner of the Champoeg at all ma-

terial times herein, and having chartered the vessel to libelant, actions under the charter party are governed by the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.

63. The Suits in Admiralty Act, Section 745 thereof, provides that suits thereunder "shall be brought within two years after the cause of action arises".

64. Section 3(6) of the Carriage of Goods by Sea Act reads in part as follows: "In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered * * *."

Findings of Fact as to the Second
Cause of Action

65. On or about July 5, 1947 at Lake Charles, Louisiana, Cities Service Oil Company delivered to the SS Champoeg a full cargo in bulk consisting of 4,200.55 barrels of aviation gasoline, 46,890.98 barrels of Koolmotor gasoline, 28,346.41 barrels of kerosene and 43,504.32 barrels of slop in good order and condition. The ship was loaded to discharge at a single port—Baltimore, Maryland. En route, she was ordered to proceed to Boston, Massachusetts, there to discharge the Koolmotor gasoline at the Cities Service Oil Company Terminal in Revere, Massachusetts, and the remainder of her cargo at East Braintree.

66. On July 12, 1947 the SS Champoeg arrived alongside the tanker dock of the Cities Service Oil Company Terminal at Revere, Massachusetts, with her cargo intact and in the same good order and condition as when shipped. In order to lie safely afloat at Revere and subsequently at East Braintree, the ship had to and did take on sea water ballast as she discharged the Koolmotor gasoline. All of the Koolmotor gasoline was discharged from the ship at Revere and Cities Service Oil Company makes no claim for shortage thereof.

67. On July 13, 1947, the SS Champoeg arrived alongside the tanker dock of the Cities Service Oil Company Terminal at East Braintree, Massachusetts, with the remaining three grades of petroleum products intact and in the same good order and condition as when shipped.

68. All of the aviation gasoline aboard the ship was discharged ashore through the stripping line and no loss of this grade occurred.

69. During the discharge of the slop and kerosene in order to keep the Champoeg safely afloat, it became necessary to discharge some of the sea water ballast. Facilities ashore were inadequate to receive the sea water ballast and were exhausted after five minutes of discharging through the starboard suction line using the starboard main pump. Thereafter, the ballast was discharged into the harbor by gravitating it through the starboard suction line to the sea suction. This removed the pressure from the starboard suction line and with the pressure remaining on the center suction line, through which the slop was being discharged, slop leaked through the cross-over valves between the two lines and an undetermined number of barrels of slop was lost with the ballast.

70. Subsequently, when the pressure of the port main pump was removed from the port suction line, through which the kerosene was being discharged, with pressure remaining on the center suction line from the center main pump, a small quantity of slop leaked through the cross-over valves between the two lines contaminating the kerosene. This contamination did not affect the bulk of the kerosene earlier discharged ashore. That part of the kerosene which was found to be contaminated in the shore line was gravitated back into the ship. When this had been done, a total of 403 barrels of kerosene remained aboard the ship which Cities Service Oil Company instructed the ship's master not to discharge although it could have been discharged as slop.

71. The ship, being unable to discharge sufficient sea water ballast, could not remove the last 36 barrels of slop from her tanks.

### Conclusions of Law as to First Cause of Action

1. This court has jurisdiction under the Suits in Admiralty Act and venue is properly laid in the Southern District of New York. 46 U.S.C.A. § 741 et seq.

2. The Suits in Admiralty Act provides that actions thereunder shall be brought within two years after the cause of action arises. 46 U.S.C.A. § 745.

3. The voyage charter party under which the cargo was carried, however, adopted the limitation period provided in Section 3(6) of the Carriage of Goods by Sea Act, which period is one year for actions arising out of loss or damage to cargo.

4. Since the cargo in question was delivered on April 22, 1947 and suit for damage thereto was not instituted until July 9, 1948, the first cause of action is time-barred.

### Conclusions of Law as to Second Cause of Action

5. This court has jurisdiction of this action under the Suits in Admiralty Act and venue is properly laid in the Southern District of New York. 46 U.S.C.A. § 741 et seq.

6. This cause of action arose on July 13, 1947 and the libel was filed on July 9, 1948. Consequently, this second cause of action was brought within the period agreed upon by the parties for the bringing of such actions.

7. Libelant has failed to sustain its burden of proving any loss of aviation gasoline for which recovery is sought occurred before the aviation gasoline left the permanent hose connections of the vessel, the place of delivery according to the terms of the charter party.

8. The evidence does show that the shortage in delivery of kerosene and slop did occur before the kerosene and slop left the permanent hose connections of the vessel.

9. None of the exceptions in the voyage charter relieves respondent from liability for the shortage in delivery of the kerosene and slop.

### Conclusions of Law Relating to Both Causes of Action

10. The decree herein should be in favor of respondent dismissing libelant's first cause of action, and in favor of libelant on the second cause of action, in an amount to be determined.